UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | No. 20 CR 54 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| EDWARD MCNAMARA, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

The government charged Defendant Edward McNamara, on January 23, 2020, with four counts of sexual exploitation of a minor. On the morning of January 27, 2020, Federal Bureau of Investigation ("FBI") agents arrested Butler and interviewed him for approximately two hours regarding the charges. McNamara now moves to suppress statements he made during the interview based on alleged violations of his Fifth Amendment rights. Because McNamara's reference to a lawyer was not sufficiently clear to invoke his Fifth Amendment right to counsel, the Court denies McNamara's motion to suppress [37].

**BACKGROUND**[1]

The government charged McNamara with four counts of sexual exploitation of a minor and issued a warrant for his arrest on January 23, 2020, based on McNamara allegedly requesting and receiving explicit photographs of Minor A and Minor B in 2015. On January 27, 2020 at approximately 7:00 a.m., FBI agents arrested McNamara at his residence in Keyser, West

---

[1] The facts in the background section are taken from the parties' briefs and the exhibits attached thereto, including a transcript and audio recording of the interview. "The parties do not disagree in any material way about the words that [McNamara] spoke when he referenced his right to an attorney. Instead, they take issue with the legal effect of those words, and that is a question of law." *United States v. Wysinger*, 683 F.3d 784, 793 (7th Cir. 2012). The Court, therefore, did not hold an evidentiary hearing prior to issuing this Opinion. *See United States v. Edgeworth*, 889 F.3d 350, 353 (7th Cir. 2018) ("District courts are required to conduct evidentiary hearings only when a substantial claim is presented and there are disputed issues of material fact that will affect the outcome of the motion." (citation omitted)).

Virginia pursuant to the arrest warrant. The agents transported McNamara to the Keyser Police Department and at approximately 7:20 a.m., FBI Task Force Officer ("TFO") Anna Doyle and FBI Special Agent ("SA") August Goodman began interviewing him regarding the charges. Prior to any questioning, TFO Doyle read McNamara his *Miranda* rights from an FBI Advice of Rights Form and then explained that if McNamara signed the form, it would indicate that he had read his rights and understood them. McNamara then read the form and, as requested, recited the last two sentences aloud: "I have read the statement of my rights and understand what my rights are at this time and I'm willing to answer questions without a lawyer present." Doc. 38-2 at 4. McNamara then said, "I don't know what the questions are yet so I don't know if I wanna sign it." *Id.* TFO Doyle and SA Goodman explained to McNamara that he could stop the questioning at any time and that his signature merely indicated that he had read and understood his rights. McNamara then signed the form and at 7:22 a.m., the agents began questioning him.

The agents first asked McNamara about his current and prior residences, phone numbers, email addresses, and Facebook accounts. McNamara answered the questions and admitted that he talked and exchanged explicit photographs with numerous women through Facebook Messenger. After showing McNamara various photographs, approximately thirty minutes into the interview, TFO Doyle asked McNamara if he could think of any Facebook activity that would have attracted the FBI's attention. McNamara responded, "Uh, well, I'm guessing it was, uh, I had gotten questioned on a, on a younger picture." *Id.* at 29. Shortly after, the agents informed McNamara that the government had charged him with child pornography and asked McNamara questions related to Minor A and conversations he had with her mother. McNamara answered the questions and explained that some of his conversations with women "would get pretty foul," *id.* at 41, and that he would "play along thinkin' things were a joke . . . and

then . . . sometimes on the rarest of rarest occasion, it wasn't," *id.* at 40.  McNamara acknowledged that he enjoyed seeing how far the women would go in response to his requests, even admitting that he "had a girl suck off her dog for [him]." *Id.* at 44.  However, McNamara insisted throughout the interview that he had never met with or touched any children.

Approximately fifty-eight minutes into the interview, in response to a question regarding his interactions with Minor B's mother, McNamara said, "Uhm, I don't know.  We're gettin' a little more specific with questions.  I, I, I don't wanna go too deep into things 'cause it's quite obviously I'm gonna have to work up some defense at some point so I don't wanna talk too much. . . . It's quite obviously I'm gonna have to deal with some form of consequence or whatever." *Id.* at 52.  The agents continued to ask McNamara questions about Minor B's mother and about McNamara's interactions with Minor B.  About ten minutes later, in response to a series of related questions, McNamara said, "[L]ike I said, this is where I, I gotta be a . . . little more careful," *id.* at 62; "Like I said this is probably where I gotta start bein' a little bit more . . . careful of what I say, you know what I'm sayin?  I don't wanna incriminate myself or get myself in trouble, you know?" *id.* at 63; and "[T]hings got spooky.  When things started getting a little darker like that.  So, I don't, yeah, I, I, I, I can't say too much more, man," *id.* at 65.

Approximately seventy-nine minutes into the interview, as SA Goodman was reading a conversation between McNamara and Minor B's mother aloud, McNamara said, "I don't know, man, I gotta be honest, I'm kinda seein' where this is goin', man, I mean, I'm, I'm, I think I probably should talk a little bit more with a lawyer." *Id.* at 72.  SA Goodman responded, "Alright . . . well . . ." as McNamara said, "And I mean, it's . . . it kinda is what it is.  I mean (studdering [sp]) I mean." *Id.*  SA Goodman then continued reading the conversation between

3

McNamara and Minor B's mother. McNamara responded, "I don't think I can talk too much more about it. I mean you got the gist, the gist of what, what you need to know. I mean, I think, I mean, I'm guessing this is . . . unless there's more matters." *Id.* at 73. The interview continued for approximately one more hour, during which McNamara answered nearly all the agents' questions. During the last hour of the interview, although McNamara said, "I can't get too much more into this, man, like I said," *id.* at 88, and "I wanna watch what I say," *id.* at 101, he did not mention a lawyer again.

## ANALYSIS

The Fifth Amendment provides that "[n]o person shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To protect this fundamental right, the Supreme Court has held that law enforcement officers must employ certain safeguards when taking an individual into custody. *Miranda v. Arizona*, 384 U.S. 436, 478–79 (1966). "One such safeguard is that law enforcement must warn [the individual] of his right to the presence of counsel during any questioning." *Subdiaz-Osorio v. Humphreys*, 947 F.3d 434, 444 (7th Cir. 2020). If the individual requests an attorney, "the interrogation must cease until an attorney is present." *Miranda*, 384 U.S. at 474. However, the individuals' request for counsel must be sufficiently unambiguous to end the questioning. *Subdiaz-Osorio*, 947 F.3d at 444. McNamara argues that his statement, "I think I should probably talk a little more with a lawyer," constituted an unambiguous request for counsel and therefore, in response, the FBI agents should have stopped questioning him. The government responds by asserting that McNamara's statement was ambiguous and therefore, the agents' continued questioning was lawful.

Determining whether a suspect's request for counsel was ambiguous is an objective inquiry; the Court must decide whether the request was "sufficiently clear[ ] that a reasonable

4

police officer in the circumstances would understand the statement to be a request for an attorney." *Davis v. United States*, 512 U.S. 452, 459 (1994). When making this determination, the Court must consider the text of the statement and the context leading up to the statement. *United States v. Hunter*, 708 F.3d 938, 945 (7th Cir. 2013). The Seventh Circuit has described an unambiguous request for counsel as a "*clear* expression of a *present desire* for an attorney," *Subdiaz-Osorio*, 947 F.3d at 446 (emphasis added), and as a statement that often "request[s] an action (or permission to act)," *United States v. Hampton*, 885 F.3d 1016, 1020 (7th Cir. 2018). "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." *Davis*, 512 U.S. at 459. Further, if a suspect makes an ambiguous or equivocal statement, although it would "often be good police practice" to do so, officers need not clarify whether the suspect is requesting an attorney. *Id.* at 461.

The Supreme Court and courts within the Seventh Circuit have held that the following statements constitute unambiguous requests for counsel: "I want an attorney before making a deal." (*Edwards v. Arizona*, 451 U.S. 477, 479 (1981)); "Can you call me an attorney?" (*Hunter*, 708 F.3d at 946); "I mean, but can I call [a lawyer] now? That's what I'm saying." (*Wysinger*, 683 F.3d at 795–96); "Can I have a lawyer?" (*United States v. Lee*, 413 F.3d 622, 626 (7th Cir. 2005)); "I want a lawyer." (*United States v. Berrios*, No. 20-cr-30048, 2021 WL 2206828, at *4 (C.D. Ill. June 1, 2021)); "Well, for one, I'd like to plead my Fifth Amendment and wait 'til I get a lawyer before I answer any questions." (*United States v. Keosackdy*, No. 19-CR-00061, 2020

5

WL 1940880, at *3 (N.D. Ind. Jan. 21, 2020)); "So can you provide me with an attorney?" (*United States v. Allegra*, 187 F. Supp. 3d 918, 924 (N.D. Ill. 2015)).[2]

In contrast, courts have determined that the following statements were too ambiguous to cease the interrogation: "Maybe I should talk to a lawyer," (*Davis*, 512 U.S. at 462); "How can I do to get an attorney here because I don't have enough to afford for one." (*Subdiaz-Osorio*, 947 F.3d at 444–45); "I think I need a lawyer, I don't know, but I want to cooperate and talk." (*United States v. Thousand*, 558 F. App'x 666, 672 (7th Cir. 2014)); "Am I going to be able to get an attorney?" (*Shabaz*, 579 F.3d at 819–20); "I can get an attorney, but I have to call them and they have to come over." (*Berrios*, 2021 WL 2206828, at *4); "I think I need, uh, somebody else to be here with me or some'in' first." (*United States v. Chatman*, No. 17 CR 611-7, 2018 WL 6248944, at *2 (N.D. Ill. Nov. 28, 2018)); "I'd want, would like to speak to a lawyer first, I guess, before anything cuz I don't know what's going on." (*United States v. Kitchenakow*, 149 F. Supp. 3d 1062, 1071–72 (E.D. Wis. 2016)).

McNamara said: "I think I should probably talk a little more with a lawyer." McNamara's statement lacks the clarity found in unambiguous invocations of counsel and instead, is more analogous to the statements found to be ambiguous or equivocal. The Seventh

---

[2] McNamara points out that the Seventh Circuit has included "I think I should call my lawyer" in a list of examples of unequivocal requests for counsel. *See United States v. Shabaz*, 579 F.3d 815, 819 (7th Cir. 2009); *Lee*, 413 F.3d at 626. However, this example came from a 1991 Eleventh Circuit case that predated *Davis*. *See Cannady v. Dugger*, 931 F.2d 752, 755 (11th Cir. 1991) (finding "I think I should call my lawyer" unambiguous largely because the interrogating officer's response clearly indicated he "knew [the suspect] wanted to speak to an attorney"). *Davis* now requires that courts utilize an objective standard when reviewing references to counsel and the Seventh Circuit has specifically cautioned against considering context after the reference to determine whether it was ambiguous. *See Davis*, 512 U.S. at 458–59 ("To avoid difficulties of proof and to provide guidance to officers conducting interrogations, this is an objective inquiry."); *Hunter*, 708 F.3d at 945 ("[C]ourts should only consider prior context when determining whether a defendant unambiguously invoked his right to counsel."). McNamara does not point to, and the Court is not aware of, any case in which the Seventh Circuit, or any Circuit after *Davis*, has found that a similar statement constituted an objectively unambiguous request for counsel. Moreover, as discussed in more detail below, the context prior to McNamara's statement, "I think I should probably talk a little more with a lawyer," and the addition of the word "probably" made the statement objectively ambiguous.

Circuit has specifically delineated between words like "can," which "mean[] that [the suspects] were inquiring into their present ability to be 'able to' obtain a lawyer" and words "like 'should' or 'might,' which would suggest that the [suspects] were still undecided about whether they wanted a lawyer." *Hunter*, 708 F.3d at 944; *see also Wysinger*, 683 F.3d at 795 (delineating between the phrase "Do I need a lawyer?" as insufficient and "Can I have a lawyer?" as sufficient). Following this delineation, every example of a sufficiently unambiguous request for counsel listed above exhibits a *clear* and *present* desire for a lawyer, *Subdiaz-Osorio*, 947 F.3d at 446 (emphasis added), using words like "can" and "want." On the other hand, every example of ambiguous or equivocal requests for counsel uses indecisive words (like "should," "maybe," or "I think") or refers to a future desire for counsel, *Hunter*, 708 F.3d at 944.

Many courts have also specifically found that using the phrase "I think" in reference to an attorney indicates indecision and ambiguity. *See Luna v. Lamarque*, 400 F. App'x 169, 172 (9th Cir. 2010) (describing "words such as 'maybe,' 'might,' or 'I think'" as "traditionally ambiguous"); *Chatman*, 2018 WL 6248944, at *3 (collecting cases that have found that "I think" "convey[s] 'indecision'"); *United States v. Thousand*, No. 12-CR-110, 2013 WL 12099113, at *6 (W.D. Wis. June 13, 2013) (collecting cases in which "[c]ourts have found that use of the word 'think' in this context fails to convey the certainty required by *Davis*"). Moreover, "probably" means "something is *likely* to happen or to be true." *Probably*, Oxford Learner's Dictionaries, https://www.oxfordlearnersdictionaries.com/us/definition/american_english/probably (last visited Oct. 7, 2021) (emphasis added). Likely needing a lawyer is necessarily different than clearly and presently needing a lawyer.

Therefore, McNamara's use of the indecisive words "I think," "I should," and "probably" makes the text of his statement equivocal under current precedent. *See, e.g.*, *Thousand*, 558 F.

App'x at 671–72 (upholding determination that "I think I need a lawyer, I don't know, but I want to cooperate and talk" was insufficient to stop questioning); *United States v. Mohr*, 772 F.3d 1143, 1146 (8th Cir. 2014) ("'I think I should get [a lawyer]' was not an unequivocal invocation of his right to counsel."); *Luna*, 400 F. App'x at 172–73 (finding "I should probably get a lawyer, I guess" insufficient to stop interrogation); *Chatman*, 2018 WL 6248944, at *3 (finding "I think I need, uh, somebody else to be here with me or some'in first" ambiguous and that "a reasonable police officer could have interpreted this phrase . . . to mean that [the suspect] had not yet decided whether he wanted an attorney with him"); *United States v. Smith*, No. CR09-5088, 2009 WL 1121091, at *1–2 (W.D. Wash. Apr. 27, 2009) (finding "I think I should probably be talking to an attorney and, and, being, you know, having him talk to you guys" could reasonably be "interpreted as having more than one meaning and therefore [the suspect] did not invoke his right to counsel").

      The context prior to McNamara's statement confirms that a reasonable officer would not have understood it to be a present request for an attorney. In the seventy-nine minutes leading up to the statement, McNamara had answered all the agents' questions regarding his explicit online activity, the agents had confronted McNamara with explicit photographs and conversations he had exchanged with women online, McNamara had acknowledged that he enjoyed seeing whether these women would follow through with his requests, and the agents had informed him that he was facing child pornography charges. Importantly, prior to referencing a lawyer, McNamara answered questions regarding his relationship with Minor A and her mother without hesitation. *Cf. Lord v. Duckworth*, 29 F.3d 1216, 1221 (7th Cir. 1994) (finding that suspect "already had confessed in a lengthy [eighty-minute], tape-recorded statement to the police and

8

agreed to assist the police in searching for the murder weapon before the first mention of a lawyer" contributed to determination that his request was ambiguous).

It was not until the agents began questioning McNamara about his relationship with Minor B's mother that McNamara expressed hesitation, saying the questions were "gettin' a little more specific," Doc. 38-2 at 52, and that he had to "be a little more careful," *id.* at 62, 63. McNamara also expressed an understanding of the potential implications of his statements by saying, "[I]t's quite obviously I'm gonna have to work up some defense at some point so I don't wanna talk too much," *id.* at 52, and "I don't wanna incriminate myself or get myself in trouble, you know?" *id.* at 63. And yet, McNamara continued to answer the agents' questions, never clearly stating that he would like to end the interrogation or speak with a lawyer. *Compare Allegra*, 187 F. Supp. 3d at 925 (noting that the fact that "Allegra asked for counsel during the early stages of his post-arrest interview while he was trying to negotiate the terms of his possible cooperation" and "did not make any incriminating admissions before asking for counsel" supported finding that his request was unambiguous), *with Thousand*, 2013 WL 12099113, at *7 (finding that the suspect's reference to an attorney occurring "after she had agreed to accompany and speak to the agents, waived her rights, and proceeded to answer questions" supported finding that the request was ambiguous). Moreover, the one ambiguous reference to a lawyer McNamara made seventy-nine minutes into the interrogation was the only time he referenced a lawyer other than reading aloud his rights. *Contra Wysinger*, 683 F.3d at 795–96 (finding that suspect's third reference to a lawyer clarified his previous ambiguous references to a lawyer and clearly invoked his right to counsel).

McNamara points to *Wysinger* and *Allegra* for support, but the facts of these cases are easily distinguishable. McNamara argues that his hesitation in signing the Advice of Rights

9

Form and answering the agents' questions regarding Minor B made his later reference to a lawyer a clear invocation of his right to counsel, like in *Wysinger* and *Allegra*. However, the prior hesitation exhibited by the suspects in *Wysinger* and *Allegra* was specifically about whether they wanted to speak to a lawyer—both made ambiguous references to a lawyer before clearly requesting one, unlike McNamara who exhibited some general hesitation in answering questions but only referenced a lawyer once. *See Wysinger*, 683 F.3d at 795–96 (finding that Wysinger's statement "I mean, but can I call one now? That's what I'm saying," clarified the ambiguous request he made immediately prior: "I mean, do you think I should have a lawyer? At this point?"); *Allegra*, 187 F. Supp. 3d at 925 (noting "Allegra made two equivocal references to an attorney before making the [unequivocal] request," "So can you provide me with an attorney?"). Moreover, the suspects in *Wysinger* and *Allegra* "used decisive language like the word 'can'—as opposed to indecisive words like 'should,'" "I think," and "probably" like McNamara. *Hunter*, 708 F.3d at 946.

      McNamara's full statement was: "I don't know, man, I gotta be honest, I'm kinda seein' where this is goin', man, I mean, I'm, I'm, I think I probably should talk a little bit more with a lawyer." Doc. 38-2 at 72. Although McNamara "*might* have invoked his right to counsel, he did not do so unequivocally or unambiguously to satisfy *Davis*." *United States v. Peters*, 435 F.3d 746, 752 (7th Cir. 2006). Therefore, the agents' continued questioning of McNamara was lawful. This is not to say that the Court condones the practice of leaving potentially ambiguous requests for counsel unclarified by law enforcement. The Court reminds law enforcement officers that it is "good police practice" to clarify ambiguous references to counsel, which the agents failed to do here. *Davis*, 512 U.S. at 461. "By affirmatively establishing whether a suspect invoked counsel, police (and reviewing courts) can know precisely where they stand.

10

We highly encourage police to follow the advice offered by the Supreme Court and take the time to clarify such issues at the time of interrogation rather than in after-the-fact arguments before the courts." *Lee*, 413 F.3d at 626–27. The Court understands that defendants may not know the "magic language" to use in clearly invoking the right to counsel while under the stress of interrogation by law enforcement. Where there is a doubt as to what a defendant means when referencing the right to counsel, it would benefit all parties involved to know precisely what that defendant intends at that moment in time and whether further questioning would place the subsequent criminal investigation at risk.

## CONCLUSION

For the foregoing reasons, the Court denies McNamara's motion to suppress [37].

Dated: October 18, 2021

SARA L. ELLIS
United States District Judge